838 So.2d 1073 (2002)
Gerald D. MURRAY, Appellant,
v.
STATE of Florida, Appellee.
No. SC95470.
Supreme Court of Florida.
October 3, 2002.
Rehearing Denied February 13, 2003.
*1075 Richard R. Kuritz, Jacksonville, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have for review appellant Gerald D. Murray's appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. For reasons that follow, we reverse Murray's convictions, vacate his sentences, including the sentence of death, and remand for a new trial.

MATERIAL FACTS
Appellant was initially convicted in 1994 for the September 1990 murder of fifty-nine-year-old Alice Vest. The jury found Murray guilty of first-degree murder, burglary of a dwelling with assault, and sexual battery and recommended death by a vote of eleven to one. The trial court followed the jury's recommendation and sentenced appellant to death. On appeal, this Court reversed the convictions and sentences and remanded the case for a new trial. See Murray v. State, 692 So.2d 157, 158 (Fla. 1997).
Murray was retried in February 1999. The evidence presented at trial revealed that on September 15, 1990, the victim (Alice Vest) arrived home around 11:30 p.m. after having dinner with a friend. Earlier that same evening, appellant and two friends, James "Bubba" Fisher and Steve Taylor,[1] had played pool together; between 10:45 and 11:15 p.m., Fisher dropped appellant and Taylor about a mile from his home. Around 12:40 a.m., another witness, who lived approximately two miles from the victim's house, saw Murray *1076 and Taylor in her barn; the men ran away when she sent her dog to attack them.
The victim's body was discovered the next morning (September 16, 1990) by a neighbor. The telephone lines leading into the house had been cut and a screen which covered the kitchen window had been removed. A shoeprint and some latent fingerprints were recovered from the scene of the crime, but none of the prints matched Taylor or Murray. In addition, several pieces of jewelry belonging to the victim were missing.
According to the medical examiner, the victim had been vaginally and anally raped and stabbed some twenty-four times. Most of the stab wounds were consistent with knife wounds, but some were consistent with infliction by a pair of scissors found near the victim's body. The victim also had a broken jaw and had been beaten about her head and face with several items, including a metal bar, a candle holder, and a glass bottle. The actual cause of death was ligature strangulation. The medical examiner asserted that the victim was probably stabbed first, then strangled with several ligatures, including a web belt and an electrical cord. Although he opined that the victim was alive during the stabbing, he could not say how long she remained conscious during the attack.
During the trial, the State admitted hair evidence found at the scene of the crime, which reflected that several hairs found on the victim's nightgown matched Murray's DNA profile. According to the State's DNA expert, Michael DeGuglielmo, the test results on those hairs also indicated the presence of a fainter, secondary DNA, consistent with the victim's DNA profile. This meant that while the fainter, secondary DNA could not be conclusively matched to the victim, the victim could not be excluded as a possible donor.
The police also recovered hairs from the victim's body. DNA tests on these hairs indicated that one matched the DNA profile of the victim and one matched the DNA profile of Taylor. Although none of these hairs matched Murray's DNA profile, DeGuglielmo testified that the test results on the hair matching the victim's DNA also indicated the presence of a fainter, secondary DNA which was consistent with Murray's DNA profile.
The hair evidence was also sent to an FBI lab in Washington, D.C., for comparison with known hair samples from three persons: Murray, Taylor, and the victim. According to Joseph DiZinno, a hair specialist with the FBI, some of the hairs found on the victim's nightgown were pubic hairs which had the same microscopic characteristics as Murray's hairs. As for the hairs found on the victim's body, the expert concluded that one of the hairs was a pubic hair which was consistent with Murray's hair. Taylor was excluded as a possible source of the hairs.
Additional evidence presented at trial revealed that approximately six months after his indictment for the murder of Alice Vest, Murray escaped from prison. While out, Murray confessed to the murder of Alice Vest to one of his co-escapees, Anthony Smith. According to Smith, Murray said that on the night of the murder Taylor came over to his house and wanted to go out. Murray initially refused, but Taylor was eventually able to convince him after the two consumed some beer. After drinking more beer, Taylor convinced Murray to rob a house, and together, the pair broke into what Murray thought was an unoccupied house. When Murray discovered the owner was home, he wanted to leave, but Taylor grabbed the female occupant, held a knife to her, and sexually assaulted her. Afterwards, Murray had the victim perform oral sex on him. Murray left Taylor alone with the victim and searched the house for things to steal. When he returned to the bedroom five or ten minutes later, Taylor had stabbed the victim. Together they found an extension cord and strangled her. On June 9, 1993, approximately seven months after his escape, *1077 Murray was captured in Las Vegas, Nevada. At the time of his arrest he was carrying two false identification cards.
The defense presented two witnesses: Dr. Howard Baum and Joseph Warren. Warren was the laboratory analyst who worked with DeGuglielmo and who actually performed the DNA tests. Warren testified that the DNA test results in this case were inconclusive and unreliable. He described several serious errors he committed during the test procedures and testified that, in addition, certain important controls were not maintained, thereby undermining the reliability of the test results. Dr. Baum, the Assistant Medical Examiner in New York City, criticized the DNA test procedures used in this case and expressed the opinion that the test results were both inconclusive and unreliable.
The jury convicted appellant of first-degree murder, burglary with assault, and sexual battery. During the penalty phase of the trial, the State presented evidence concerning appellant's three prior convictions for felonies in which he used violence or the threat of violence. The State also presented victim impact evidence from the victim's friend and daughter. The defense did not present any evidence or witnesses during the penalty phase.
The jury recommended death by a vote of twelve to zero, and the trial court followed the recommendation in imposing a sentence of death. The trial court found four aggravating factors to which it attributed substantial weight, found no statutory mitigators, but found five nonstatutory mitigating factors based on information presented in a PSI report.

ANALYSIS
Appellant raises nine issues for this Court's review, all of which pertain solely to the guilt/innocence phase of the trial.[2] As Murray's fourth issue is dispositive, we treat it first.[3]

Frye v. United States
Murray challenges the admissibility of the DNA evidence introduced by the State on the ground that the procedure used in testing the DNA in this case did not comply with the accepted standards to ensure reliability and, therefore, the evidence should have been excluded.[4] Specifically, he argues that the DNA evidence should have been ruled inadmissible because the laboratory's testing procedures did not meet the standards generally accepted within the scientific community and hence fell below the requirements for admissibility under Frye v. United States, 293 F. 1013 (D.C.Cir.1923).
We begin our analysis with the premise that the trial court's ruling on a *1078 Frye issue is subject to de novo review on appeal. See Brim v. State, 695 So.2d 268, 274 (Fla.1997). Therefore, we must review the trial court's ruling "as a matter of law rather than by an abuse of discretion standard." Id.
In Henyard v. State, 689 So.2d 239 (Fla.1996), we explained the applicable law when reviewing a claim that DNA testing procedures did not meet the necessary standards:
In Robinson v. State, 610 So.2d 1288 (Fla.1992), cert. denied, 510 U.S. 1170, 114 S.Ct. 1205, 127 L.Ed.2d 553 (1994), we explained:
In admitting the results of scientific tests and experiments, the reliability of the testing methods is at issue, and the proper predicate to establish that reliability must be laid. Ramirez v. State, 542 So.2d 352 (Fla.1989). If the reliability of a test's results is recognized and accepted among scientists, admitting those results is within the trial court's discretion. Stevens v. State, 419 So.2d 1058 (Fla.1982), cert. denied, 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983). "When such reliable evidence is offered, "any inquiry into its reliability for purposes of admissibility is only necessary when the opposing party makes a timely request for such an inquiry supported by authorities indicating that there may not be general scientific acceptance of the technique employed." Correll v. State, 523 So.2d 562, 567 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988) (emphasis supplied).
Id. at 1291. Subsequently, in Hayes v. State, 660 So.2d 257, 264 (Fla.1995), we took judicial notice "that DNA test results are generally accepted as reliable in the scientific community, provided that the laboratory has followed accepted testing procedures that meet the Frye test to protect against false readings and contamination."
Id. at 248-49 (emphasis added) (footnote omitted). Great emphasis was placed on the recommendations of the National Research Council (NRC) concerning the standards and methodology for DNA testing. See Hayes v. State, 660 So.2d 257, 262 (Fla.1995). The NRC explained that when courts apply the Frye test to DNA testing procedures, they should acknowledge that the reliability of DNA testing is based on the assumption that the analytical work comported with the proper procedures. Id. at 263. This is an issue that
can be resolved only case by case and is always open to question, even if the general reliability of DNA typing is fully accepted in the scientific community. The DNA evidence should not be admissible if the proper procedures were not followed. Moreover, even if a court finds DNA evidence admissible because proper procedures were followed, the probative force of the evidence will depend on the quality of the laboratory work. More control can be exercised by the court in deciding whether the general practices in the laboratory or the theories that a laboratory uses accord with acceptable scientific standards. Even if the general scientific principles and techniques are accepted by experts in the field, the same experts could testify that the work done in a particular case was so flawed that the court should decide that, under Frye, the jury should not hear the evidence.
Id. (quoting Victor A. McKusick, Preface to Committee on DNA Technology in Forensic Sciences, National Academy of Sciences, DNA Technology in Forensic Science at 133-34 (1992)) (emphasis removed). In making the determination as to whether the proper procedures were followed, however, courts are not confined only to the NRC's recommendations. Instead, the NRC recommendations are but one example of the testing procedures that meet the requirements of Frye for admissibility. Henyard, 689 So.2d at 249.[5]
*1079 In the case at hand, the trial court permitted the DNA test results to be admitted, finding that it was for the jury to determine the weight which should be ascribed to the test results:
The Court's function in considering the validity and reliability of the procedures performed by Mr. DeGuglielmo and his laboratory is essentially that of a gatekeeper. There can be no question that expert testimony will generally be of assistance to jurors in assessing DNA evidence. Defendant herein contends, however, that due to mistakes allegedly made during the testing in this case, the flaws in methodology and processes underlying the tests render their results so unreliable as to require exclusion from evidence. Defendant's objections can be divided into two principal categories:
(1) allegations amounting to claims of inexact recordkeeping, and (2) challenges as to the potential causes and explanations of dual indications with respect to three of the polymarkers.
As to the recording or clerical errors (characterized as "scrivener's errors"), the Court finds that, although certain errors in recording or memorializing portions of the data clearly occurred, these errors were in large part addressed and explained by the State's witnesses and were neither individually nor collectively significant enough to cast doubt upon the viability of the tests themselves, the reliability of the final results of the testing procedures, or the conclusions derived therefrom. The Court reaches this same conclusion with regard to defendant's objections regarding the DNA amplification, independent review, following of appropriate protocols, and potential for contamination of the evidence. While Defendant is certainly free to argue this point to a jury, the Court does not find that the errors which occurred are significant to the degree that they undermine the viability of the tests, the reliability of the test results, or the expert testimony to a degree requiring exclusion of the evidence.
As to the dispute regarding the significance of the "fainter" allele representations in various polymarkers, the Court finds the testimony of the State's expert to be persuasive. Though defense experts suggested that it was (at least theoretically) possible that the fainter allele was the result of a heterozygous donor or various other factors, both the submitted scientific data and the testimony of the State's experts demonstrate that the result is more likely than not the result of a mixture of DNA on the specimens resulting from the nature of the evidence at the scene; this is particularly true given the vast disparities in the strength of the indicators. In any event, though the experts may draw different conclusions from the test results, the testimony presented does not undermine the viability of the tests or the reliability of the results. Thus, these differing expert opinions pose no bar to the admissibility of the tests or results; *1080 the respective credibility of the experts, and the weight ultimately ascribed to their testimony, shall be determined by the jury.
Accordingly, the Court is persuaded that the scientific methods and procedures employed by Mr. DeGuglielmo, and the conclusions derived therefrom, are sufficiently reliable so as to meet the threshold requirements for admissibility under both the Frye and Ramirez-Brim-Murray standards. Further, the Court is persuaded that the testimony of Dr. Tracy regarding population statistics and the probability results derived therefrom likewise satisfy these standards.
We disagree.
Because the State was seeking to introduce the DNA test results, it bore the burden of proving the general acceptance of "both the underlying scientific principle and the testing procedures used to apply that principle to the facts of the case at hand." Ramirez v. State, 651 So.2d 1164, 1168 (Fla.1995). Numerous problems occurred, most of which concerned the significance of fainter alleles which appeared during the DNA testing. Even the State's expert, DeGuglielmo, testified that in order for DNA testing to be generally accepted as reliable within the scientific community, there must be an independent review by a second qualified analyst. In this case, Warren, a senior forensic scientist, conducted the tests and performed the initial review; he concluded that the test results were inconclusive because the faint alleles were too faint and ambiguous to be interpreted decisively. His supervisor, DeGuglielmo, reviewed Warren's report and disagreed, submitting a written DNA report which concluded that the tests were conclusive, that the hair sample was consistent with Murray's DNA, and that the faint alleles were consistent with the victim's DNA.[6] DeGuglielmo never discussed with Warren the inconsistencies in the two reports or the possibility of another independent review. The State's argument that the two inconsistent reports meet the requirements of "a second independent review" is unavailing. If the purpose of the second review is to assure the reliability of the testing, this is hardly accomplished when the analyst conducting the initial testing and his supervisor conducting the "independent review" reach *1081 opposing conclusions. The results from the DNA testing become more uncertain, rather than more conclusive. This defeats the entire purpose of a second independent review and renders the initial review meaningless. Accordingly, as the defense experts explained, one of the elements of a second independent review is to ensure that the results of the initial review were reliable, and should the two analysts disagree, the tests should be deemed inconclusive in the absence of further analysis.
Not only did the initial analyst and his supervisor disagree as to the results of the tests, but the analyst failed to properly document the required controls of the testanother step which the experts agree is required within the scientific community. Specifically, the analyst failed to take a picture of one of the control strips which would have shown whether the tests had been contaminated. This is particularly troubling in this case since there was expert testimony that the results normally should not have produced any fainter alleles and that contamination is a possible explanation for the presence of the fainter alleles. DeGuglielmo testified that normally hair follicles would not show fainter alleles of a different DNA because the hair root is the only portion of the hair which contains DNA. He contended, however, that fainter alleles could have occurred because the hair contacted some other substance like blood or semen, thus causing a mixture of DNA to appear. His explanation is troubling, particularly in light of Warren's testimony that when he performed the DNA testing, he washed the strands of hair in xylene and then washed the hair a second time in ethanol to remove the xylene; hence, there should have been no other substance on the hair. In addition, Warren admitted that he did not perform a hair shaft controla control which would have shown whether the hair had any other DNA substance on it.
The unreliability of the testing procedures was compounded by the facts that (1) the State's expert used all of the DNA found in the hair, rendering it impossible for the defendant to conduct his own independent analysis; and (2) there was a general sloppiness in documenting the tests which even the analyst admitted was below the standards normally accepted.[7] Because of the clerical errors and the below-standard documentation and paperwork, other experts who were retained by the defense were unable to adequately review the test results since necessary portions of the documentation were missing.
Based on the unique combination of errors and problems which occurred in the tests and the lack of documentation, we find that the State did not meet its burden in demonstrating the general acceptance of the testing procedures which were used in this case. Accordingly, we reverse the convictions, vacate the sentences, and remand for a new trial to be conducted in a manner consistent with this opinion. Although this issue is dispositive, we address *1082 other grounds raised on review that we deem worthy of comment.

Evidence Tampering
In the next two issues raised by Murray, he argues that the trial court erred in admitting the test results from hairs recovered from the victim's body and from the victim's nightgown because the evidence had been tampered with. The trial court denied this claim, concluding that the defense failed to present proof to indicate "a probable likelihood of tampering." It reasoned that any objection to the admission of the evidence would be overruled until the defense showed something more than suspicions and conjectures. We disagree in part.
In reviewing these claims, we start with the basic legal principle that "[r]elevant physical evidence is admissible unless there is an indication of probable tampering." Peek v. State, 395 So.2d 492, 495 (Fla.1980); see also Dodd v. State, 537 So.2d 626 (Fla. 3d DCA 1988). In seeking to exclude certain evidence, Murray bears the initial burden of demonstrating the probability of tampering.[8] Once this burden has been met, the burden shifts to the proponent of the evidence to submit evidence that tampering did not occur.[9]
Murray contends that the evidence from the victim's body should have been excluded because it was tampered with or altered. The police claimed to have recovered only two hairs from the victim's body, whereas the expert with the FBI who conducted the tests stated that he received and tested several hairs.[10] Murray challenges this apparent discrepancy.
In support of his claim, Murray points to the portion of the record where Detective Chase testified that he collected two hairs from the victim's body, one from her chest and one from her leg. When asked if he counted the number of hairs collected, Chase responded, "I believe it was two hairs but I can't be positive as far as that goes. I mean I didn't have a microscope or anything to look at hairs, but I believe there was two." Chase testified that he placed the hairs in an envelope and then placed the envelope in the property room of the Jacksonville Sheriff's Office. That evidence was later sent to the FBI for comparison. Joseph DiZinno, the expert at the FBI, testified that he received debris from the victim's nightgown and hairs from the victim's body. When asked by defense counsel how many hairs he examined from the victim's body, DiZinno responded that he examined "several" Caucasian hairs. However, he stated that the FBI "doesn't count hairs so ... there could be as few as five and as many as twenty-one" hairs.
We find that Murray did not overcome his initial burden in demonstrating the probability of evidence tampering relative to the hairs collected from the body. Neither the officer who collected the hairs nor the analyst who received the hairs was sure as to the exact number of hairs at issue. Chase thought he collected only *1083 two but stated that he was not positive. DiZinno, on the other hand, acknowledged that because he does not count hairs, he could not give an exact figure as to how many hairs he received. Murray's allegations amount to mere speculation, and hence the trial court did not commit error in admitting the hairs into evidence.
Murray also argues that the test results on hairs recovered from the victim's nightgown should have been excluded because of questions concerning the bag in which the nightgown had been placed. According to the record on appeal, a bag of evidence initially contained a nightgown and a bottle of lotion when it was sealed, but when the bag was received by the FDLE, the lotion bottle was missing. Specifically, Officer Laforte testified that he collected a bottle of hand lotion and a nightgown from the same location and placed them both in the same bag in order to keep them together. The bag containing the nightgown and lotion was given to FDLE for processing. Ms. Warniment, an analyst with the FDLE, received six sealed bags to perform trace evidence recovery on the items, one of which contained a white tube-top garment which was described as a nightgown. Despite the fact that the sealed bag had no indications that it previously had been opened, it did not contain the bottle of lotion. This discrepancy was never explained.
In reviewing the testimony of Officer Laforte and Ms. Warniment, we find that the defendant carried his burden in demonstrating the probability of evidence tampering.[11] Laforte clearly remembered placing both the bottle of lotion and the nightgown in the same bag and specifically did so in order to keep them together. The analyst who received the sealed bag, however, stated unequivocally that although the bag had not been previously opened, it no longer contained the lotion and further she never received the lotion. We find that based on this obvious discrepancy, the defendant has met his burden of showing the probability of evidence tampering, and hence the burden shifted to the State to explain the discrepancy or to submit evidence that tampering did not occur. As the State failed to meet its burden, the trial court erred in finding the challenged evidence admissible.

Witness Tampering
In his third claim, appellant contends that the trial court erred in denying the defense's request that it be allowed to impeach DeGuglielmo with evidence that DeGuglielmo, the State's expert, had telephoned Warren, the defense's expert witness, in an attempt to influence the defense expert testimony. Murray argues that by denying the defense the opportunity to impeach the credibility of the State's expert witness, the trial court committed reversible error.
During the Frye hearing, the defense learned that DeGuglielmo had called Warren prior to his taking the stand in this case. The defense intended to impeach DeGuglielmo's credibility with this evidence, to which the State objected. The defense then offered the following proffer in support of its request:
DEFENSE ATTORNEY: What did he say to you?
WITNESS [WARREN]: Hethe first thing he asked was, "You don't keep a phone log, do you?" And I laughed I said, "No, no, we're not keeping a phone log." He said, "when are you going to be in"and this is paraphrasing, *1084 "When are you going to be in town andin Jacksonville?" And I said, "Well, it looked like I was going to be in Wednesday but I think it's going to be Thursday." He said, "I was wondering if we could have lunch together." And I said, "Well, I'm not going to be there." He said, "That's too bad." He said, "I have been on the stand quite a bit and it has been," to use histo paraphrase, "a challenge, that the defense attorney has been doingdoing herkeeping me on the stand quite a while."
THE COURT: This is true. I've been here the whole time.
THE WITNESS: Yes, sir. He said that I should review our depositionmy deposition, that I shouldhe saidI recall our conversation inininin Ft. Lauderdale prior tothe day before your deposition, which we went over those errors, and the last thing he said, "I want you to know that you should not consider Ms. Warren your friend, that she will try to get you to impeach my evidence," words to this effect, to the best of my memory, "but then get it on the record that you've made all these sloppy mistakes and have it both ways." I said, "Well, she is defending her client, she's going to give her client the best defense possible." And that was it. He said, "I hope I see you soon," and the conversation ended within minutes.
. . . .
DEFENSE ATTORNEY: And how did that make you feel?
WITNESS: I got the feeling, if I may, that I was to be circumspect in my dealings with you.
The trial court sustained the State's request to preclude the defense from offering the above evidence, finding that the testimony was not relevant and that there was no proof that DeGuglielmo acted on behalf of the State in calling Warren or that DeGuglielmo attempted to influence Warren's opinion. The trial court's ruling to exclude this testimony on this basis was error.
In relevant part, section 90.608(2), Florida Statutes (1999), states: "Any party, including the party calling the witness, may attack the credibility of a witness by... [s]howing that the witness is biased." Denying a defendant the opportunity to present evidence that a witness is biased not only violates section 90.608(2), it also implicates a defendant's constitutional right to cross-examination which is guaranteed by the Sixth Amendment to the United States Constitution and article I, section 16 of the Florida Constitution. "Inherent within this right is a defendant's right to expose a witness's motivation in testifying because it is the principal means by which the believability of a witness and the truth of his testimony are tested." Gibson v. State, 661 So.2d 288, 291 (Fla. 1995) (internal quotation marks omitted).
In this case, DeGuglielmo was presented as an unbiased expert who was merely reading the results of the test. However, as the testimony above demonstrates, DeGuglielmo called Warren shortly before he was to testify and warned him that defense counsel would try to "impeach [DeGuglielmo's] evidence" and that Warren needed to recall an earlier conversation that the two had about the errors which occurred in the case. This conversation would be relevant to a determination of whether DeGuglielmo was truly an unbiased expert merely reading the results of a test or was attempting to persuade Warren to testify in a manner which would support DeGuglielmo's prior testimony. In either case, this determination is relevant to a disputed fact (DeGuglielmo's credibility as an unbiased witness) and it was error for the trial *1085 judge to exclude the conversation from the jury's consideration.[12]

Evidence of Escape
In issue five, Murray argues that the trial court committed reversible error by allowing the State to introduce evidence that Murray had escaped from prison and had used a false identification card and a false social security card. He contends that these crimes were not relevant to the crime charged because the escape occurred two years after the murder in this case while Murray was in prison on an unrelated charge and the use of false documents was unrelated to the murder. Thus, Murray contends that the State improperly used this evidence solely to show Murray's propensity to commit crimes. The State, on the other hand, argues that evidence of escape is relevant to show consciousness of guilt.
We find no error in the trial court's decision permitting the State to present evidence of appellant's prison escape to show consciousness of guilt. The law is well established that "[w]hen a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible, being relevant to the consciousness of guilt which may be inferred from such circumstance." Straight v. State, 397 So.2d 903, 908 (Fla.1981); accord Thomas v. State, 748 So.2d 970, 982 (Fla.1999). To be admissible, however, the State must establish a sufficient nexus between the flight or escape and the crime for which the defendant is being tried in the instant case in order to demonstrate relevance and materiality. Escobar v. State, 699 So.2d 988, 995 (Fla.1997), abrogated on other grounds by Connor v. State, 803 So.2d 598 (Fla.2001). Murray argues that due to the time delay between the murder and indictment for that crime and the date the escape occurred, the jury could not reasonably infer that Murray escaped from prison to avoid prosecution for the murder charges.
In Escobar, we found the evidence of a shootout with police in California was insufficient to establish a connection to a murder committed in Florida where the shootout occurred twenty-seven days after the murder, there was no indication that the defendants were aware that they were the subject of a murder investigation in Florida, and the defendants did not become suspects in the Florida murder until after the California shootout. See id. at 996. Similarly, in Merritt v. State, 523 So.2d 573 (Fla.1988), we found that evidence of the defendant's escape while being transported to Florida for prosecution on charges unrelated to the murder charge in that case was insufficient to establish that the defendant escaped to avoid prosecution for the murder. The defendant in Merritt did not attempt to escape until three years after committing the murder and nine months after becoming aware that he was a suspect in the murder investigation. We reasoned that "[a] jury could not reasonably infer from these facts that Merritt escaped to avoid prosecution for the Davis murder. Such an inference would be the sheerest of speculation." See id. at 574.
Here, the Vest murder occurred in September, 1990, but Murray was not indicted for the murder until April 9, 1992. The escape from the Duval County Jail did not occur until November 22, 1992, approximately *1086 seven months after Murray was indicted. Unlike the defendants in Escobar and Merritt, however, Murray was in prison on a grand jury indictment for murder, burglary, and sexual batteryi.e., the very offenses for which he was tried in the instant case, at the time he escaped. Under these circumstances, even though significant time had passed since the date the murder occurred, the jury could reasonably infer that Murray escaped from jail to avoid being prosecuted for Vest's murder, the charge that landed him in jail.
Likewise, we find no error in the admission of evidence relating to Murray's use and possession of false identification cards at the time of his arrest. At trial, David Kerns, an agent with the FBI, testified that when Murray was arrested in Las Vegas after his escape from prison he had in his possession two identification cards with the name of Doyle White on them. It would not be unreasonable to conclude that appellant used these cards to conceal his true identity so as to further evade capture and prosecution. The use of false identification, therefore, constituted additional evidence relevant to appellant's guilty knowledge at the time of his arrest. Accordingly, we affirm the trial court's ruling.

Motion to Suppress Murray's Statements
Murray argues that the trial court erred in not suppressing his statements to the police. He contends that Detective O'Steen told him that his DNA matched the DNA found at the murder scene. Murray then attempted to explain how that would be possible. However, the DNA evidence that Detective O'Steen referred to was later declared inadmissible by this Court in Murray v. State, 692 So.2d 157 (Fla.1997). Therefore, Murray argues that because the DNA test results had been declared inadmissible, any responses to O'Steen's questions referring to the DNA evidence should also be declared inadmissible.[13] The trial court overruled the objection, finding that Murray's response to the question was voluntary and therefore admissible.
We find this claim to be without merit. The record reveals that at trial, Detective O'Steen testified that he interviewed Murray on April 8, 1992. During the interview, O'Steen told Murray that hairs found at the scene of the crime matched his hairs and asked him how his hair could have been found at the crime scene.[14] Murray responded that he had pulled a "bag of reefer" out of his crotch and gave it to Taylor and that his hair must have stuck to the bag. When the officers asked for more details about the "reefer bag," Murray did not remember and then gave a second scenario to explain the presence of his hair. According to Murray, some of his hairs could have been on Taylor's clothes and fallen off when Taylor removed his clothes to have sex with the victim. O'Steen asked Murray how he knew Taylor had removed his clothes, to which Murray responded that he assumed that is what happened.
On appeal, Murray argues that because this Court found the DNA test results admitted in Murray's first trial to be inadmissible, any statements by Murray in response *1087 to the officer's comment that his DNA matched DNA found at the scene should also be held inadmissible. We agree with the trial court that the sole issue concerning Murray's statements appears to be whether they were voluntarily made. "The State must show by a preponderance of the evidence that the confession was freely and voluntarily given and that the rights of the accused were knowingly and intelligently waived." Escobar v. State, 699 So.2d 984, 987 (Fla.1997); see also Thompson v. State, 548 So.2d 198, 204 (Fla.1989). The record here reveals that prior to questioning Murray, O'Steen advised him of his Miranda[15] rights. Murray stated that he understood his rights and then waived them by signing a waiver form. Murray did not ask to speak to a lawyer or state that he did not want to talk to O'Steen. According to O'Steen, Murray was not under the influence of alcohol at the time of the interview, he was not threatened or coerced in any way, and he was not promised anything in exchange for his statements. As noted above, the trial court ruled that Murray's statements to the police were voluntary and therefore admissible. Accordingly, we conclude that the trial court did not err in admitting Murray's statements to Detective O'Steen.

Sufficiency of the Evidence
Finally, Murray contends that the evidence presented at trial was insufficient to support the trial court's denial of his motion for judgment of acquittal, and he should have been acquitted of the charges. "On appeal of a denial of a motion for JOA where the State submitted direct evidence, the trial court's determination will be affirmed if the record contains competent and substantial evidence in support of the ruling." LaMarca v. State, 785 So.2d 1209, 1215 (Fla.), cert. denied, 534 U.S. 925, 122 S.Ct. 281, 151 L.Ed.2d 207 (2001). In this case, the State submitted direct evidence that Murray confessed to a co-escapee. Based on our review of the record, there was competent, substantial evidence upon which the jury could return a first-degree murder verdict. Thus we find that the trial court properly rejected this motion.

CONCLUSION
Based on the foregoing analysis, we reverse Murray's convictions, vacate his sentences, and remand this case for a new trial.
It is so ordered.
SHAW, PARIENTE, and QUINCE, JJ., concur.
ANSTEAD, C.J., concurs in result only with an opinion.
LEWIS, J., concurs in result only.
WELLS, J., dissents with an opinion, in which HARDING, Senior Justice, concurs.
ANSTEAD, C.J., concurring in result only.
I agree with the majority that the outcome of this death penalty case should not be allowed to rest upon the highly flawed DNA evidence that was admitted over objection at trial. This case presents a highly unusual scenario whereby the expert who is asked to evaluate the evidence for the State concludes that the test results are inconclusive and unreliable and yet the results are still admitted at trial. In addition, there is a concession that the established protocol for testing and evaluating the evidence was not followed. In short, the expert who did the testing says sorry, but I can't help you.
*1088 Nevertheless, because another expert at the same laboratory disagrees with the initial evaluator's conclusion, the evidence is admitted. Even that expert, however, concedes the serious protocol violations. One of the protocol requirements, in fact, is that a second expert verify the outcomes reached by the first expert. Of course, here, as noted by the majority opinion, the entire purpose of having a second expert is to provide a safeguard in the form of an additional check that will validate the first expert's evaluation. The protocol contemplates the necessity of this validation before the outcome can be deemed conclusive and reliable. Here, there was no validation, there was conflict and disagreement. Hence, the requirement of validation set out in the protocol was not met.[16]
While we have recognized the scientific authenticity of DNA evidence and the methods recognized in the scientific community for testing, we have not granted a carte blanche for the admission of any DNA evidence. To the contrary, we have required a demonstration that accepted protocols established to ensure the authenticity of outcomes be followed before test results may be admitted in court. Surely, if there is one category of legal cases in which we should be certain that these important testing and evaluation protocols are followed, it is in death cases.
WELLS, J., dissenting.
I dissent because I believe the trial judge properly denied the objections to the DNA evidence. In a well-reasoned order, the trial judge stated:
In evaluating defendant's motion, the Court must consider: (1) whether such expert testimony would assist the jury in understanding the evidence or deciding the facts in issue; (2) whether the testimony is based on a scientific principle which has gained general acceptance in the particular scientific community; and (3) whether the expert witness is sufficiently qualified to render an opinion on the subject. This test must be repeated independently for each stage of the DNA process (the methodology and processes employed as well as the calculation of population frequency statistics). The burden is on the State, as the proponent of this evidence, to demonstrate by a preponderance of the evidence that this standard has been satisfied. Murray v. State, 692 So.2d 157 (Fla.1997); Brim v. State, 695 So.2d 268 (Fla.1997); Hayes v. State, 660 So.2d 257 (Fla.1995); Ramirez v. State, 651 So.2d 1164 (Fla. 1995).
The Court's function in considering the validity and reliability of the procedures performed by Mr. DeGuglielmo and his laboratory is essentially that of a gatekeeper. There can be no question that expert testimony will generally be of assistance to jurors in assessing DNA evidence. Defendant herein contends, however, that due to mistakes allegedly made during the testing in this case, the flaws in methodology and processes underlying the tests render their results so unreliable as to require exclusion from evidence. Defendant's objections can be divided into two principal categories: (1) allegations amounting to claims of inexact recordkeeping, and (2) challenges as to the potential causes and explanations of dual indications with respect to three of the polymarkers.
As to the recording or clerical errors (characterized as "scrivener's errors"), the Court finds that, although certain *1089 errors in recording or memorializing portions of the data clearly occurred, these errors were in large part addressed and explained by the State's witnesses and were neither individually nor collectively significant enough to cast doubt upon the viability of the tests themselves, the reliability of the final results of the testing procedures, or the conclusions derived therefrom. The Court reaches this same conclusion with regard to defendant's objections regarding the DNA amplification, independent review, following of appropriate protocols, and potential for contamination of the evidence. While defendant is certainly free to argue this point to a jury, the Court does not find that the errors which occurred are significant to the degree that they undermine the viability of the tests, the reliability of the test results, or the expert testimony to a degree requiring exclusion of the evidence.
As to the dispute regarding the significance of the "fainter" allele representations in various polymarkers, the Court finds the testimony of the State's expert to be persuasive. Though defense experts suggested that it was (at least theoretically) possible that the fainter allele was the result of a heterozygous donor or various other factors, both the submitted scientific data and the testimony of the State's experts demonstrate that the result is more likely than not the result of a mixture of DNA on the specimens resulting from the nature of the evidence at the scene; this is particularly true given the vast disparities in the strength of the indicators. In any event, though the experts may draw different conclusions from the test results, the testimony presented does not undermine the viability of the tests or the reliability of the results. Thus, these differing expert opinions pose no bar to the admissibility of the tests or results; the respective credibility of the experts, and the weight ultimately ascribed to their testimony, shall be determined by the jury.
Accordingly, the Court is persuaded that the scientific methods and procedures employed by Mr. DeGuglielmo, and the conclusions derived therefrom, are sufficiently reliable so as to meet the threshold requirements for admissibility under both the Frye and Ramirez-Brim-Murray standards. Further, the Court is persuaded that the testimony of Dr. Tracy regarding population statistics and the probability results derived therefrom likewise satisfy these standards.
In respect to the claim of evidence tampering, we have said that relevant physical evidence is admissible unless there is an indication of "probable tampering." Peek v. State, 395 So.2d 492, 495 (Fla.1980). I do not find that appellant's assertions in respect to the hair and lotion bottle support a claim of "probable tampering" so as to hold that the trial judge abused his discretion. There was simply no evidence presented at trial that the evidence containers which stored the various items had been altered in any way.
The other errors found by the majority to have been made by the trial court, if error at all, were harmless beyond a reasonable doubt based upon this record.
HARDING, Senior Justice, concurs.
NOTES
[1] Taylor was Murray's accomplice. He was tried in 1992 for the murder of Alice Vest and was convicted of first-degree murder, burglary of a dwelling, and sexual battery. The jury recommended death, which the trial court followed. On appeal, this Court affirmed Taylor's convictions and sentence. See Taylor v. State, 630 So.2d 1038 (Fla.1993). Many of the same facts are set forth in that opinion.
[2] These issues include: (1) probable tampering of hair evidence found on the victim's body; (2) probable tampering of a lotion bottle; (3) witness tampering; (4) improper admission of DNA evidence; (5) improper admission of collateral crimes; (6) destruction of the evidence by the State; (7) sufficiency of the evidence to convict; (8) denial of the motion to compel the names of attorneys who were involved in other cases tested at the same DNA lab as appellant; and (9) improper denial of the motion to suppress statements. Because the first two issues involve the same legal question, they have been addressed together under the same heading.
[3] Because we grant relief and order a retrial based on an improper admission of DNA evidence, two of Murray's other claims are rendered moot: destruction of the DNA evidence by the State; and denial of the motion to compel the names of attorneys who were involved in other cases tested at the same DNA lab.
[4] These alleged violations include: (1) the lack of an independent review by a second qualified analyst to protect against bias; (2) the lack of a substrate shaft control used to protect against contamination; (3) the absence of critical documentation necessary to provide an independent review to ensure the absence of contamination; (4) the manipulation of the digitized printouts of the evidence by the State's expert; (5) the violation of the manufacturer's instructions on the DNA testing kit; and (6) Microdiagnostics, the lab that conducted the DNA tests, violated their own protocols.
[5] The specific challenge in Henyard involved whether the DNA testing procedure utilized by the Florida Department of Law Enforcement (FDLE) was unreliable because: (1) the laboratory was not in compliance with the recommendations of the NRC; and (2) the only person who testified as to the tests' reliability was the person who conducted the tests. We concluded that the trial court did not abuse its discretion in admitting the test results where it was established that the type of test conducted was generally accepted in the scientific community, the NRC did not question the validity of the type of test conducted, the FDLE's analyst who performed the test was subject to proficiency testing and never failed a test, and the FDLE utilized explicit written quality controls which were consistent with NRC recommendations. Id. at 249.
[6] DeGuglielmo's determination that the tests conclusively show that the fainter alleles were consistent with the victim's DNA is made even more problematic by his testimony that the results obtained from the fainter alleles might not be reliably repeated in subsequent testing:

The fainter types [of alleles] that we see are indicative of a smaller amount of DNA from a secondary source. We only see partial profiles because the DNA is going to be below the threshold of producing a reliable reproducible result for that secondary minor profile that is there. The reason for that, if you follow what I was saying earlier about the sensitivity of the tests, we're looking at a targeta minimal target range of about one nanogram of DNA for these particular tests. That's one nanogram of total DNA in the sample that will give us a result.
Now, if we have a mixture that's, say, 90%, 10%, or 95%, 5%, so that the mixture is ten to one or twenty to one, and the cumulative amount of DNA that is there is right at the threshold for detectability, then the minor component, alone by itself would be below that threshold so any result resulting from that secondary profile may or may not show a consistent type from amplification to amplification because it's below, in and of itself, it's below the sensitivity level of the test. We can't separate it out, we can't remove it because we don't have a methodology for doing that, but it is present in a quantity that doesn't allow it to be reproducibly amplified time and time again.
(Emphasis added.)
[7] Specifically, when questioned by defense counsel, Warren testified as follows:

Q: Do you have an explanation for why there were those clerical errors that you'd like to share with the jury?
A: Well, we were quite busy at the time. We were very busy, as a matter of fact. If you look at the evidence on some of these work sheets you will see gels from differentevidence from different cases ganged together on the same gel, and it was, at the time, an expedient issue there.
Q: And, sir, I know that this is not easy for you. Would you admit that the paperwork and the documentation that came out of Micro Diagnostics at that time was below what would be normally accepted?
A: It was, to be blunt, sloppy.
Q: Thank you, sir.
A: And below standards.
[8] State v. Taplis, 684 So.2d 214, 215 (Fla. 5th DCA 1996) ("[T]he burden of one attempting to bar otherwise relevant evidence is to show a likelihood of tampering (probability)....").
[9] Taplis v. State, 703 So.2d 453, 454 (Fla. 1997) ("[O]nce evidence of tampering is produced, the proponent of the evidence is required to establish a proper chain of custody or submit other evidence that tampering did not occur."). See also Dodd v. State, 537 So.2d 626 (Fla. 3d DCA 1988).
[10] It should be noted that Murray moved to exclude the hair evidence on this same ground during the 1994 trial. The trial court apparently denied the motion. Murray raised this claim on appeal. However, we declined to treat the issue because of our determination concerning the DNA evidence.
[11] See, e.g., Dodd, 537 So.2d at 628 (holding that "conflicting descriptions of the bag [of evidence] and the gross discrepancies in the recorded weights and packaging details indicate probable tampering").
[12] Although the State initially objected to the admission of this testimony based on hearsay grounds, it does not make such an argument on appeal. Hence as this ground is not addressed, we do not speak to this contention here.
[13] Murray's subclaim that he was denied the ability to effectively cross-examine Detective O'Steen about lying to him about the DNA in order to obtain his confession is without merit. At the time Detective O'Steen questioned Murray, the DNA test results had indicated a match.
[14] During the trial, O'Steen never mentioned that Murray's DNA matched DNA found at the scene. Instead, he phrased his response that Murray's hair matched hair that was found at the scene.
[15] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[16] For an example of the utilization of this protocol in Florida, see Florida Dep't of Law Enforcement, Forensic Science Quality Manual, § 2.2.11 (2002).