PER CURIAM.
Phillup Alan Partin appeals his conviction of first-degree murder and sentence of death.[1] For the reasons stated below, we affirm his conviction and sentence.
I. BACKGROUND
On July 31, 2002, 16-year-old Joshan Ashbrook was reported as a runaway. She left the house early that morning and was walking beside the road near her house when she met Partin at an intersection. Partin, who was driving his seven-year-old daughter in a maroon pickup truck, offered to give the victim a ride. Soon afterward, the victim called her boyfriend’s residence using a cellphone in Par-tin’s possession. Minutes after placing the call, Ashbrook arrived at her boyfriend’s house in a pickup truck described as burgundy, gave her boyfriend’s mother a note to pass along to her boyfriend, and left in the same pickup truck.
Law enforcement later discovered that the cellphone from which the victim called that morning was registered to Partin’s ex-girlfriend, who once lived with Partin and bought Partin a maroon pickup truck. When the detective called the number, Partin answered the phone and identified himself using a false surname. At that time, Partin admitted to giving a young girl a ride to her boyfriend’s house in his blue pickup truck and allowing her to use his phone on the way. He also told the detective that he dropped the girl off at a nearby store immediately afterward. The detective told Partin that the girl was dead and indicated a need to speak with him.
Law enforcement obtained video from the store to which Partin said he took the victim. The video depicted the victim arriving with Partin and Partin’s daughter in a maroon pickup truck. It further documented all three of them leaving the store in Partin’s truck, contrary to Partin’s statement.
Hours after leaving the store with the victim and his daughter, Partin received a warning for fishing without a license. The wildlife enforcement officer who issued the warning recalled that Partin had a red pickup truck and that a female and a small child accompanied him. Partin later admitted to receiving the warning and providing a pair of his shorts to the victim so that she could go swimming. After fishing and swimming, the three returned to Fred *36 and Diana Kaufman’s house, where Partin and his daughter were staying.
Later that day, Diana Kaufman observed Partin’s daughter and another female sitting in Partin’s room playing video games. She noticed that the female was wearing shorts. Mrs. Kaufman did not see the female’s face and did not see her leave the house. But Mrs. Kaufman did notice that Partin’s truck was in the driveway that day, that the truck was gone that night, and that Partin returned alone at 1:00 a.m. the next day. Partin’s daughter testified that she played video games with the victim, that her father and the victim left that night without her, and that she never saw the victim again. Ashbrook died the night of July 31 or sometime prior to 3:30 a.m. the next day.
The next morning, the victim’s body was discovered in a wooded area approximately 50 feet from a highway. Law enforcement observed tire tracks indicating that a light pickup truck had backed up to the area where the body was found. A passerby later reported to law enforcement that he saw a dark-colored pickup truck backed up into the woods where the body was discovered.
Ashbrook’s body was found with her shirt pulled up to the top of her shoulder blades, and she was nude from the waist down. Her neck had been cut open, she had six incisor wounds on her face, and her hands and arms bore defensive wounds. The victim had ligature marks on her neck, wrists, and ankles, and petechial hemorrhages indicated that she was strangled. The ultimate cause of death was blunt head and neck trauma. There was no indication of sexual assault. A hair was embedded in one of the defensive wounds and was taken for testing.
In the days following the murder, Partin left the Kaufmans’ house and, without disclosing his intended destination, dropped off his daughter with a friend. He then abandoned his truck and ultimately left Florida. When law enforcement recovered the truck, the tires failed to match the impressions taken from the scene, and there was no sign of blood in the truck.
Sometime after Partin had moved out of the Kaufmans’ house, law enforcement recovered a camera from his room and found that he had taken pictures of his truck at a time when the truck had tires matching the impressions at the scene. Law enforcement also found a box that belonged to Partin containing hair clippings with largely degraded DNA consistent with the DNA found in the hair taken from the victim’s defensive wound. A portion of the carpet underneath a rug in his room at the Kaufmans’ house contained bleach stains and blood matching the victim’s DNA profile. Law enforcement also found small spots of blood on the room’s walls matching the victim’s DNA profile.
In the months following the murder, Partin made three telephone calls to the detective assigned to the case, asking about his daughter. Partin also responded to questioning about the murder and admitted that he picked up the victim, took her fishing, and then drove her back to the Kaufmans’ house. He told the detective that he dropped the victim off at the same intersection where he had picked her up and denied any sexual contact or involvement in her murder. The telephone calls were recorded and played for the jury.
In October 2003, over a year after the murder, Fred Kaufman agreed to cooperate with law enforcement and placed a recorded telephone call to Partin. Partin told Kaufman that he was in North Carolina, that he had changed his appearance, and that he considered himself a “dead man.” Partin also spoke to Kaufman about Partin’s participation in a recent *37 fight and indicated that he had lied to law enforcement after the fight in order to avoid giving a statement.
Partin was arrested in North Carolina later that month. Partin’s DNA profile matched the hair found in the victim’s defensive wound at all points. In a videotaped interrogation, Partin waived his Miranda[2] rights, again admitted to spending the day with the victim, and again denied involvement in the murder.
Partin was first tried in October 2007. He was retried in March 2008 following an inadvertent discovery violation. After the retrial, the jury found Partin guilty of first-degree murder.
At the penalty phase, the State presented evidence that, in 1987, Partin had been arrested and later indicted for first-degree murder, armed robbery, and burglary but entered a plea agreement under which he was convicted of second-degree murder, armed robbery, and burglary. After hearing brief mitigation testimony from Par-tin’s daughter and ex-girlfriend, the jury recommended the death penalty by a vote of nine to three.
At a Spencer[3] hearing, Partin presented expert testimony from two psychologists. The first psychologist, Dr. McClain, diagnosed Partin with polysubstance dependence based on past alcohol, marijuana, and painkiller abuse, cognitive disorder resulting in part from head trauma, and major depressive disorder recurrent. The second psychologist, Dr. Eisenstein, diagnosed Partin with bipolar disorder and intermittent explosive personality. Both experts also recognized that Partin’s biological father, with whom Partin lived until he was twelve, physically and emotionally abused Partin and abused others in Par-tin’s presence.
After hearing the additional evidence, the trial court followed the jury’s recommendation and found two aggravators: (1) the murder was especially heinous, atrocious, or cruel (great weight); and (2) pri- or violent felony (great weight). The trial court found no statutory mitigators and the following nonstatutory mitigators: (1) Partin can be productive and a positive influence on others in prison (little weight); (2) Partin is a good father and good provider (little weight); (3) Partin is a good friend, good boyfriend, and a compassionate person (little weight); (4) Partin maintained steady employment when not incarcerated (little weight); (5) Partin has a mental disorder (some weight); (6) Partin has brain abnormalities (little weight); and (7) Partin had a difficult childhood (little weight).
II. ISSUES RAISED ON APPEAL
Partin raises six claims on appeal: (A) the trial court erred in denying several motions in limine; (B) the trial court erred in admitting the testimony of DNA analyst Suzanna Ulery from Partin’s first trial; (C) the trial court erred at the guilt phase in denying the jury’s request to view the indictment or have the indictment read to them; (D) the trial court erred at the penalty phase by providing improper instructions to the jury; and (E) the death sentence is not proportionate.[4] None of these claims warrant relief.
*38 A. Motions in Limine
At trial, Partin filed numerous motions in limine designed to suppress any references to Partin’s prior felony conviction, previous incarceration, attempts to obtain false identification, and incriminating statements to others. He also sought to excise, from Partin’s recorded statements to law enforcement, Partin’s statements containing profanity, inconsistent explanations of his contact with the victim, references to the death penalty, indications that he disliked law enforcement, acknowledgment of weapon ownership, and admissions to collateral crimes, as well as numerous statements from law enforcement in which officers insisted that Partin further explain himself. The trial court conducted hearings to address these motions and issued orders that, in many cases, specifically identified the irrelevant or unduly prejudicial statements and required their exclusion. The excluded evidence included evidence that Partin was incarcerated as a convicted felon and arrested for another crime, had two tattoos signifying two murder victims, told law enforcement he would shoot one of the detectives, and owned a knife and certain other weapons. The trial court also granted Partin’s motions seeking to suppress recorded statements from law enforcement that characterized the evidence against Partin. Pursuant to these orders, the prosecution redacted its audio and video recordings and refrained from questioning its witnesses as to these matters.
Nevertheless, Partin argues that the trial court erred in denying portions of six motions in limine, generally claiming that the evidence was irrelevant and portrayed him as a violent criminal. The State responds that the evidence was properly admitted as relevant to demonstrate consciousness of guilt. We conclude that the trial court did not reversibly err.
“[T]his Court has allowed the admission of evidence as relevant to consciousness of guilt where a suspect in any manner attempts to evade prosecution after a crime has been committed.” Penalver v. State, 926 So.2d 1118, 1132 (Fla.2006) (citing Straight v. State, 397 So.2d 903, 908 (Fla.1981)). Such evidence may be relevant because it demonstrates that the defendant “was aware of the criminality of his actions ... and the precarious position he was in” if prosecuted. Brooks v. State, 918 So.2d 181, 204 (Fla.2005).
To determine the relevancy of such evidence to consciousness of guilt in a particular case, the question is whether the evidence “indicates a nexus between the flight, concealment, or resistance to lawful arrest and the crime(s) for which the defendant is being tried in that specific case.” Escobar v. State, 699 So.2d 988, 995 (Fla.1997), abrogated on other grounds by Connor v. State, 803 So.2d 598 (Fla.2001) In other words, where there is no evidence that would allow the jury to reasonably infer that the defendant was attempting to avoid prosecution for the offense on trial, the evidence is not relevant. See id.
However, even relevant, probative evidence may be inadmissible “if its probative value is substantially outweighed by the danger of unfair prejudice.” § 90.403, Fla. Stat. (2002). This assessment of relative weight entails consideration of “the need for the evidence, the tendency of the evidence to suggest an improper basis to the jury for resolving the matter, the chain of inference necessary to establish the material fact, and the efficacy of any limiting instruction.” Brooks, 918 So.2d at 204.
We review a trial court’s ruling on the admission of evidence advanced to demonstrate consciousness of guilt for abuse of discretion. See Jackson v. State, *39 18 So.3d 1016, 1031 (Fla.2009). The challenged motions are addressed in turn.z

1. Partin’s recorded telephone call to the detective

In the months following the murders, Partin placed three telephone calls to the detective. In one of those telephone calls, Partin agreed to meet with the detective on the condition that they meet unarmed and in a remote location. In that context, Partin remarked that he owned firearms but had secured them out of his reach. He acknowledged that he “was not supposed to have any” firearms. Although Partin moved to exclude these statements prior to trial, the statements were included in the recording played for the jury during trial without objection from Partin. On appeal, he argues that this statement could have led the jury to believe he was a convicted felon.
Even assuming the claim was properly preserved, it was harmless beyond a reasonable doubt because there was no reasonable possibility that the mention of firearms in this context affected the verdict. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). First, Partin’s statements did not clearly suggest that he was a violent person; in fact, Partin indicated that the guns were inaccessible to him and that he did not want to bring a gun to a meeting with the detective. Second, because this case involved stabbing and blunt head trauma, gun ownership did not suggest to the jury that Partin committed this crime. See Carter v. State, 560 So.2d 1166, 1168 (Fla.1990) (concluding that admission of a gun and knife was harmless where the victim was killed by asphyxiation); see also Brooks, 918 So.2d at 204 (determining that admission of a threat to shoot a police officer was not prejudicial because the murder involved stabbing, not shooting). Finally, Partin’s comment that he “was not supposed to have any” firearms was vague, isolated, and did not become a feature of the trial. See Rodriguez v. State, 753 So.2d 29, 43 (Fla.2000) (concluding that admission of testimony indicating that the defendant had a police “ID number” and used aliases was harmless error because it was brief and isolated); see also Consalvo v. State, 697 So.2d 805, 813-14 (Fla.1996) (concluding that collateral crime evidence was harmless error where it did not become a feature of the trial).
Therefore, the trial court’s admission of the evidence was harmless beyond a reasonable doubt.

2. Videotaped interrogation

Following his arrest, Partin submitted to questioning by law enforcement. Numerous statements made during questioning were redacted from a videotape of the interrogation in accordance with the trial court’s partial grant of Partin’s motions in limine. Among the statements permitted to remain was Partin’s statement that, after leaving Florida, he kept a gun with him at all times in case law enforcement came for him and that he would consider using the gun if police attempted to arrest him.
This Court has repeatedly affirmed the admission of evidence of flight and resistance to arrest where the defendant was fleeing prosecution for the charged crime. See, e.g., Thomas v. State, 748 So.2d 970, 982-83 (Fla.1999); Shellito v. State, 701 So.2d 837, 840-41 (Fla.1997); Bundy v. State, 471 So.2d 9, 20-21 (Fla.1985). More specifically, this Court has affirmed, under those constraints, admission of evidence that the defendant expressed his intent to shoot a police officer. See, e.g., Brooks, 918 So.2d at 202-04; Wyatt v. State, 641 So.2d 355, 358 (Fla.1994). In Brooks, 918 So.2d at 204, this Court found that the defendant’s statement that he was “going *40 to have to shoot” an approaching officer provided proof of consciousness of guilt because, at the time of the statement, the defendant possessed evidence that would have been incriminating for purposes of the charged crime. Likewise, in Wyatt, 641 So.2d at 358, this Court determined that the trial court properly admitted the defendant’s statement to police officers upon his arrest that he “was glad he did not have a gun when he got stopped, otherwise he would have shot the officer” because the statement was relevant to show the defendant’s consciousness of guilt.
Here, there was a sufficient, identifiable nexus between thé evidence and the charged crime. Partin’s statement demonstrated that he was avoiding prosecution and revealed his belief that police were tracking him as a suspect in this murder. His flight and the related fact that he considered shooting an arresting officer demonstrated that Partin “was aware of the criminality of his actions ... and the precarious position he was in” if stopped by law enforcement. Brooks, 918 So.2d at 204. Additionally, the statement was not unfairly prejudicial because evidence that Partin carried and considered using a gun if confronted was unlikely, by itself, to suggest to the jury that Partin committed this crime, which did not involve guns. See id. (determining that admission of a threat to shoot the police officer was not unfairly prejudicial because the murder involved stabbing, not shooting).
Because the trial court did not abuse its discretion in admitting the videotaped statements, we affirm.

3. Partin’s recorded telephone call from jail to a friend

After he was arrested and jailed in North Carolina, law enforcement recorded a telephone call made by Partin in which he told a friend, “[I]f I get a chance ... it took ‘em a year and a half to get me, it’ll take them longer next time.” On appeal, Partin argues that admission of the statement was error because it was unduly prejudicial and because the jury may have decided against life imprisonment based on the assumption that Partin would try to escape.
This Court has affirmed the admission of evidence of escape or planned escape as relevant to show consciousness of guilt as long as there is a sufficient nexus between the escape and the charged crime. See, e.g., Jackson, 18 So.3d at 1031; Murray v. State, 838 So.2d 1073, 1085 (Fla.2002). A nexus exists between escape plans and the charged crime where the defendant is incarcerated and awaiting adjudication of the charges on trial. See Jackson, 18 So.3d at 1031 (“There were no other charges from which Jackson could have been attempting to escape other than this capital trial.”); Murray, 838 So.2d at 1086 (“Murray was in prison on a grand jury indictment for ... the very offenses for which he was tried in the instant case, at the time he escaped.”).
Here, there was a sufficient, identifiable nexus between the statement and the charged crime because, at the time of the statement, Partin was jailed only for the charges at issue in this trial. Whether the statement indicated a desire to flee prior to trial, escape from prison, or both, it was probative of the fact that he “was aware of the criminality of his actions ... and the precarious position he was in” if fully prosecuted. Brooks, 918 So.2d at 204.
As for Partin’s argument that the jury may have recommended death because they feared he would attempt to escape from prison, Partin did not preserve this argument for appeal because it was not raised below. See Hoskins v. *41 State, 965 So.2d 1, 14 (Fla.2007) (“For an issue to be preserved for appeal, ... it ‘must be presented to the lower court and the specific legal argument or ground to be argued on appeal must be part of that presentation if it is to be considered preserved.’”) (quoting Perez v. State, 919 So.2d 347, 359 (Fla.2005)). Even if the argument had been preserved, any error would have been harmless beyond a reasonable doubt. See DiGuilio, 491 So.2d at 1135. Because the statement was not made a feature of the guilt phase of trial and was not even mentioned at the penalty phase of trial, there was no reasonable possibility that the admission of Partin’s statement affected the verdict or the jury’s sentence recommendation.
Therefore, the trial court did not abuse its discretion in admitting this recorded statement. Accordingly, we affirm its denial of this motion in limine.

4. Partin’s possession and attempt to obtain false identification

Partin sought to exclude evidence that he attempted to obtain someone else’s social security number and that he was in possession of someone else’s social security card when arrested. The prosecution introduced this evidence but did not present any accompanying evidence of Partin’s intent to use the numbers.
This Court has affirmed the admission of evidence on the use and possession of false identification cards as evidence probative of consciousness of guilt. See Murray, 838 So.2d at 1086. In Murray, the trial court allowed the prosecution to present evidence that the defendant had used and possessed a false identification card and social security card. Id. at 1085. In affirming the trial court’s ruling, this Court concluded:
It would not be unreasonable to conclude that appellant used these cards to conceal his true identity so as to further evade capture and prosecution. The use of false identification, therefore, constituted additional evidence relevant to appellant’s guilty knowledge at the time of his arrest.
Id. at 1086; see also Samuels v. State, 11 So.3d 413, 417 (Fla. 4th DCA 2009) (holding that evidence of false identification in numerous forms was relevant to consciousness of guilt).
Here, the trial court did not err in allowing evidence that Partin had attempted to obtain and was found in possession of false identification cards. As in Murray, the evidence constituted evidence of flight probative of Partin’s consciousness of guilt on the charges for which he was sought and ultimately apprehended. See Murray, 838 So.2d at 1086. Additionally, the evidence of false identification was not unfairly prejudicial to Partin because it “was a de minimis part of the evidence” presented in support of the murder. Looney v. State, 803 So.2d 656, 668 (Fla.2001). The false identification cards were introduced as a mere part of the overall theme that Partin had committed the murder and was avoiding detection.
Therefore, the trial court did not abuse its discretion in allowing the prosecution to admit evidence of Partin’s possession and attempt to obtain false identification. Accordingly, we affirm denial of this motion in limine.

5. Partin’s unsolicited statement to law enforcement when arrested

Upon his arrest in North Carolina, Partin announced to law enforcement officers that he had a gun at his home in North Carolina and another in Florida. The trial court partially granted Partin’s motion in limine concerning this statement, excluding any evidence of the *42 Florida gun but allowing the statement regarding the gun in North Carolina.
Here, Partin’s unsolicited statement indicates that he “was aware of the criminality of his actions ... and the precarious position he was in” when stopped by law enforcement. Brooks, 918 So.2d at 204. Specifically, it shows that Partin knew law enforcement had a reason to arrest him and would consider him dangerous. Though approximately one year had passed since the time of the crime, other evidence indicated that, at the time of the arrest, Partin was aware that he remained the suspect in the criminal investigation of this crime. See Murray, 838 So.2d at 1086 (finding a sufficient nexus “even though significant time had passed since the date the murder occurred” and the time the defendant escaped); cf. Penalver, 926 So.2d at 1134 (finding insufficient nexus between the defendant’s threat of suicide and crime “because at the time he made the threat, he was not under arrest and had not been threatened with prosecution”).
Therefore, the trial court did not abuse its discretion. Accordingly, we affirm the partial denial of this motion in limine.

6. Partin’s recorded telephone call with Fred Kaufman

Partin filed a motion in limine seeking to exclude several portions of the recorded telephone conversation between Fred Kaufman and Partin. The trial court granted the motion in part, excluding certain statements regarding a firearm not owned or possessed by Partin. But the trial court allowed the prosecution to play portions of the recording in which Partin told Kaufman that he intervened in a fight because a drunk man was hitting a girl. Partin did not give detail on the incident but did state that the attacker he confronted ended up with his “head split wide ... out.” Partin also told Kaufman that law enforcement responded but did not take his statement because he told officers he “was just walking by.” The trial court allowed Partin’s report of the altercation on the ground that it was “inextricably intertwined with information showing the defendant’s efforts to avoid detection and arrest, hence his consciousness of guilt.”
On appeal, Partin does not dispute that portions of the conversation focusing on his attempt to avoid arrest were relevant to show consciousness of guilt. Instead, he argues that the trial court erred in finding that evidence of the physical altercation was inextricably intertwined.
Even if the trial court abused its discretion in admitting evidence of Partin’s involvement in a fight, the error was harmless because there is “no reasonable possibility that the error contributed to the conviction.” DiGuilio, 491 So.2d at 1135. First, Partin’s statement does not describe “bad conduct.” Partin was motivated to confront a man because the man was drunk and hitting someone else. Second, Partin’s vague description of the fight was the only mention of the altercation. Given these circumstances, the trial court’s admission of the evidence was harmless beyond a reasonable doubt.
In sum, we find no reversible error in the trial court’s rulings on Partin’s motions in limine.
B. Admission of Former Testimony
Partin argues that the trial court erred in admitting the testimony of DNA analyst Suzanna Ulery from Partin’s first trial. More specifically, Partin argues that Ulery was not “unavailable” for purposes of the former testimony hearsay exception. See § 90.804(2), Fla. Stat. (2002). For the reasons that follow, we affirm admission of the former testimony.
*43 The Florida Evidence Code allows for the admission of former testimony against a defendant in a criminal trial when the witness is “unavailable” and the defendant “had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.” Id.; see Muehleman v. State, 3 So.3d 1149, 1163 (Fla.2009). One circumstance rendering a witness “unavailable” for purposes of the hearsay exception is one in which (1) the witness is unable to testify “because of then-existing physical or mental illness or infirmity”; and (2) the inability to testify is not “due to the procurement or wrongdoing of the party who is the proponent of his or her statement in preventing the witness from attending or testifying.” § 90.804(1), Fla. Stat. (2002).
Whether an illness or infirmity exists is a question of preliminary fact for the trial court, proven by a preponderance of the evidence. See § 90.105(1), Fla. Stat. (2002); Charles W. Ehrhardt, Florida Evidence §§ 105.1, 804.1 (2010 ed.). The trial court’s decision to admit prior testimony is reviewed for abuse of discretion. Muehleman, 3 So.3d at 1162.
Here, the trial court did not abuse its discretion in admitting the former testimony. The prosecution presented evidence that Ulery was living in California, would be approximately four months pregnant at the time of the trial in March, and was advised by her doctor not to travel by airplane until late August. Though there was no specific evidence of complications attending Ulery’s pregnancy, the trial court relied on advice from her obstetrician and determined that the limitation on her travel was attributable to the pregnancy. The trial court further observed that flying would be the easiest and most effective means of travel from California to Florida, and it found that even those means were unavailable to Ulery.
Furthermore, because the trial court determined that Ulery was unavailable under section 90.804 and that Partin had an opportunity to cross-examine her in a prior trial on the same subject matter, Partin was not deprived of his Sixth Amendment right to confrontation. See Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (“[T]he Sixth Amendment demands what common law required: unavailability and a prior opportunity for cross-examination.”); Muehleman, 3 So.3d at 1163-64 (allowing an unavailable witness’s testimony from a prior trial); Murray v. State, 3 So.3d 1108, 1124 (Fla.2009) (same). And even if the trial court erred in finding that Ulery was “unavailable” under section 90.804(l)(d), any violation of the Confrontation Clause was harmless because the testimony was ultimately cumulative. Other DNA analysts testified that the DNA found on the victim matched Partin’s DNA with a high degree of probability. See Hogan v. State, 3 So.3d 1204, 1210 (Fla.2009) (“[W]here the evidence introduced in error was not the only evidence on the issue to which the improper evidence related, the introduction can be harmless.”).
Therefore, we affirm the trial court’s decision to admit the former testimony.
C. Jury’s Guilt-Phase Request for the Indictment
Partin argues that the trial court erred in declining to provide the jury with a copy of the indictment or read the indictment to the jury. We disagree.
A trial court has discretion to provide a copy of the indictment to the jury. Fla. R.Crim. P. 3.400(a) (2002) (“The court may permit the jury, upon retiring for deliberation, to take to the jury room ... a copy of the charges against the defendant ....”) (emphasis added). A trial court’s determination under rule 3.400 is reviewed *44 for abuse of discretion. See Barnes v. State, 970 So.2d 332, 339 (Fla.2007).
In this case, given the discretion explicitly afforded to trial judges and the limited benefit of the indictment to the jury, the trial court did not abuse its discretion in refusing to provide a copy or read the indictment to the jury. The charge against Partin would not have greatly assisted the jury in reaching a verdict as the jury received instructions on the elements of first-degree murder and heard a more detailed case against Partin at trial. Additionally, Partin’s indictment was, like any charging document, an allegation based on evidence that went unchallenged by the defendant at grand jury proceedings and may or may not have been presented at trial. See Miller v. State, 42 So.3d 204, 217 (Fla.2010) (“A grand jury session is an ex parte proceeding which usually does not consider both sides of an issue.”), cert. denied, — U.S. -, 131 S.Ct. 935, 178 L.Ed.2d 776 (2011).
Therefore, we affirm the trial court’s ruling.
D. Penalty-Phase Jury Instructions
Next, Partin asserts entitlement to a new penalty phase because the trial court issued allegedly misleading penalty-phase jury instructions. Specifically, Partin argues that the trial court should have granted two requests for special jury instructions and that the trial court misread one of the standard jury instructions. For the reasons that follow, we disagree.

1. Partin’s requested special instruction

Among the proposed jury instructions requested by Partin was an instruction to the jury that it was “never required to recommend a sentence of death.” “[F]ailure to give special jury instructions does not constitute error where the instructions given adequately address the applicable legal standards.” Coday v. State, 946 So.2d 988, 994 (Fla.2006) (quoting Stephens v. State, 787 So.2d 747, 755 (Fla.2001)). A trial court’s denial of special jury instructions is reviewed for abuse of discretion. See Hudson v. State, 992 So.2d 96, 112 (Fla.2008).
Here, the trial court provided standard instructions repeatedly approved by this Court as an adequate description on the role of the penalty-phase jury. See Phillips v. State, 39 So.3d 296, 304 (Fla.), cert. denied, — U.S. -, 131 S.Ct. 520, 178 L.Ed.2d 384 (2010). And in any event, the trial court did not abuse its discretion in rejecting Partin’s request because his requested instruction was more stringent than required under applicable case law. See In re Std. Jury Instr. in Crim. Cases-Report No. 2005-2, 22 So.3d 17, 22 (Fla.2009) (rejecting a proposed amendment stating that the jury is “never required to recommend a sentence of death” in favor of “less stringent” language consistent with “our state and federal case law in this area”).
Accordingly, the trial court did not err in denying Partin’s request.

2. Prosecution’s requested special instruction

Next, Partin argues that the trial court should have instructed the jury that great weight would be given to its sentencing recommendation, a statement not included in the standard instructions at the time of trial. See Std. Jury Instr. in Crim. Cases-No. 96-1, 690 So.2d 1263, 1265 (Fla.1997). Again, this Court has held that the instruction, as given, adequately addresses the role of the penalty-phase jury. See Phillips, 39 So.3d at 304. Furthermore, at trial, Partin objected to this instruction, rendering this claim im *45 proper. See id. (“[T]he defense cannot now reasonably complain of an instruction it requested or any error it invited.”).
Accordingly, the trial court did not err in delivering the standard instruction.

3. Prior violent felony instruction

Finally, Partin argues that the trial court misled the jury when it instructed the jury that a prior violent felony aggra-vator is established when “the defendant has been previously convicted of a felony involving the use of abuse of violence to some person.” (Emphasis added.) The standard instruction stated that the aggra-vator is established when “[t]he defendant has been previously convicted of another capital offense or of a felony involving the [use] [threat] of violence to some person.” Std. Jury Instr. in Crim. Cases-No. 96-1, 690 So.2d at 1265.
The instruction given was substantially similar to the standard instruction and did not contain misleading language. Even if it was error to provide this instruction, the error was harmless because the jury was provided with correct written instructions. See Victorino v. State, 23 So.3d 87, 101 (Fla.2009) (“An error in a jury instruction is harmless if there is ‘no reasonable possibility that the faulty instruction contributed to the verdict.’ ”) (quoting Hunter v. State, 8 So.3d 1052, 1071 (Fla.2008)); Colon v. State, 730 So.2d 780, 782 (Fla. 3d DCA 1999) (noting that misstatement of standard jury instructions was “harmless given the fact that the complete written jury instruction was sent to the jury room -with the jurors during their deliberations”).
In sum, the trial court did not reversibly err in providing penalty-phase instructions.
E. Proportionality
Partin argues that his sentence of death is not proportionate. We disagree, however, and conclude that the sentence is proportionate.
This Court is required to review the proportionality of a death sentence “in order to prevent the imposition of unusual punishments under the Florida Constitution.” Phillips, 39 So.3d at 305. However, in analyzing proportionality, “[t]his Court’s function is not to reweigh the mitigating facts against the aggravating factors; that is the function of the trial judge.” Id. (quoting Connor v. State, 803 So.2d 598, 612 (Fla.2001)). Instead, “[i]n deciding whether death is a proportionate penalty, this Court considers the ‘totality of the circumstances in a case’ and compares the case with other capital cases.” Id. (quoting Urbin v. State, 714 So.2d 411, 417 (Fla.1998)). As it compares the case with others, this Court performs “a two-pronged inquiry ... to ‘determine [whether] the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders.’ ” Ault v. State, 53 So.3d 175, 196 (Fla.2010) (quoting Almeida v. State, 748 So.2d 922, 933 (Fla.1999)), cert. denied, — U.S. -, 132 S.Ct. 224, 181 L.Ed.2d 124 (2011). The review is a “qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.” Urbin v. State, 714 So.2d 411, 416 (Fla.1998). In other words, “comparison is not simply a calculation of the number of aggravators and miti-gators.” Lebron v. State, 982 So.2d 649, 668 (Fla.2008).
In this case, the jury recommended death by a nine-to-three vote. The trial court found two aggravators and gave them both great weight: (1) the murder was especially heinous, atrocious, or cruel *46 (HAC);[5] and (2) prior violent felony.[6] And this Court has indicated that the prior violent felony and HAC aggravators are “two of the most weighty in Florida’s sentencing calculus.” Sired v. Moore, 825 So.2d 882, 887 (Fla.2002). Additionally, the trial court found no statutory miti-gators but seven nonstatutory mitigators: (1) Partin can be productive and a positive influence on others in prison (little weight); (2) Partin is a good father and good provider (little weight); (3) Partin is a good friend, good boyfriend, and a compassionate person (little weight); (4) Par-tin maintained steady employment when not incarcerated (little weight); (5) Partin has mental disorder (some weight); (6) Partin has brain abnormalities (little weight); and (7) Partin had a difficult childhood (little weight).
This Court has found the death sentence proportionate in similar cases. See, e.g., Merck v. State, 975 So.2d 1054, 1066 (Fla.2007) (death sentence proportionate with aggravators of HAC and prior violent felony, statutory mitigation of young age, and three nonstatutory mitigators); Ocha v. State, 826 So.2d 956, 960 (Fla.2002) (death sentence proportionate with aggravators of HAC and prior violent felony and numerous nonstatutory mitigators including history of substance abuse and severe head injuries); Singleton v. State, 783 So.2d 970, 972-73 (Fla.2001) (death sentence proportionate with aggravators of HAC and prior violent felony, three statutory miti-gators including extreme or emotional disturbance, and nine nonstatutory mitigators including defendant’s use of alcohol at the time of the crime); Spencer v. State, 691 So.2d 1062 (Fla.1996) (death sentence proportionate with aggravators of HAC and prior violent felony based on aggravated assault, aggravated battery, and attempted second-degree murder, two statutory miti-gators, and numerous nonstatutory miti-gators including sexual abuse by defendant’s father); see also Butler v. State, 842 So.2d 817, 833 (Fla.2003) (death sentence proportionate where victim was strangled and stabbed multiple times with HAC ag-gravator and with nonstatutory mitigators including long-term substance abuse); Ferrell v. State, 680 So.2d 390, 391 (Fla.1996) (death sentence proportionate where prior violent felony was based on second-degree murder and with a number of miti-gators).
Accordingly, we find the death penalty proportionate.
III. SUFFICIENCY OF THE EVIDENCE
This Court independently reviews the record of a death penalty case to determine whether the evidence is sufficient to support the murder conviction. See Winkles v. State, 894 So.2d 842, 847 (Fla.2005). Here, there is competent, substantial evidence to support the murder conviction. See Durousseau v. State, 55 So.3d 543, 559 (Fla.2010), cert. denied, — U.S. -, 132 S.Ct. 149, 181 L.Ed.2d 66 (2011).
As set forth above, hair with Partin’s DNA was imbedded in one of the victim’s *47 defensive wounds, and blood matching the victim’s DNA was found in Partin’s room. Partin repeatedly admitted that he picked up the victim in his burgundy truck and gave her a ride to her boyfriend’s house, then to a nearby store. The boyfriend’s mother testified that she saw the victim in a burgundy truck, and video obtained from the store depicted Partin and the victim arriving in a truck and leaving together. Partin admitted to providing his shorts to the victim, to going fishing and swimming with her, and to bringing her back to his room in the Kaufman’s home. Mrs. Kaufman and Partin’s daughter also testified that the victim was in his room that afternoon. Partin’s daughter further testified that Partin and the victim left together that night and that she never saw the victim again, while Mrs. Kaufman testified that Partin left the home and returned alone in the early morning hours. A pickup truck was seen later that morning backed up to the woods where the body was found, and tire tracks matching those depicted in photos of Partin’s truck were observed next to the body.
Accordingly, there is sufficient evidence to support the murder conviction.
IV. CONCLUSION
For the reasons expressed above, we affirm Partin’s conviction and sentence of death.
It is so ordered.
CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Partin also claims that his sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Yet Ring does not apply to cases where, as here, a prior violent felony aggravator exists. See Hodges v. State, 55 So.3d 515, 540 (Fla.2010), cert. denied, - U.S. -, 132 S.Ct. 164, 181 L.Ed.2d 77 (2011).

. The medical examiner testified that the victim had defensive wounds on her hands and arms, that her neck had been cut open, that she had six incisor wounds on her face, that she had ligature marks on her neck, wrists, and ankles, that she had petechial hemorrhaging consistent with strangling, and that she was finally killed from blunt head and neck trauma.

. As discussed previously, the prior violent felony in this case was based on 1987 second-degree murder, armed robbery, and burglary convictions. Partin confessed to those crimes and entered a plea agreement following indictment for first-degree murder, armed robbery, and burglary.