FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA
_____

No. 1D2023-1115
_____

DA'VHON YOUNG, SR.,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____


On appeal from the Circuit Court for Leon County.
Jason Lee Jones, Judge.


July 9, 2025

RAY, J.

Da'vhon Young was convicted of first-degree murder and sentenced to life in prison. The conviction arose from the discovery of a woman's body in a plastic storage bin in a remote area of Leon County. Police connected the victim to Young, who had hired her to entertain him in his hotel room. During a recorded police interview, Young confessed to strangling her to death but claimed he did so in self-defense.

On appeal, he raises two issues: (1) whether a fundamental error occurred when the prosecutor's opening statement suggested that Young confessed to murder during his police interview and (2) whether the trial court abused its discretion by denying a motion

to exclude evidence concerning Young's ankle monitor. Finding both arguments meritless, we affirm.

I

Young first argues that the prosecutor's opening statement wrongly implied he admitted to murdering the victim. In Young's view, this was inaccurate because he told the police he acted in self-defense. He claims the prosecutor's comment created the false impression that the State possessed incriminating evidence that was never actually presented to the jury. As a result, Young contends this misrepresentation undermined his only defense and deprived him of a fair trial.

During the State's opening, the prosecutor described the evidence that Young had arranged to meet the victim for sex and strangled her to death. The prosecutor discussed surveillance footage, DNA evidence, and the medical examiner's testimony, interspersed with references to the admissions from Young's police interview that corroborated that evidence. Then the prosecutor explained:

> Our story doesn't stop there. **You're going to hear from the defendant's own mouth in that interview with law enforcement. He decides, well, now, I've committed a murder. I've got to cover it up.** He goes to what he calls a trap house, a nearby house and retrieves a plastic bin and some clothes, brings the bin back to his room. Keeping in mind, never once does he call 911, does he call for help, medical assistance, nothing like that. You're not going to hear any evidence of that. In fact, you'll hear the defendant admit he probably should have called for help but didn't. But instead, he goes to get this plastic bin.

(Emphasis added). The prosecutor went on to describe Young's efforts to conceal the victim's body and dump it in a rural area.

Young did not object below, so this issue can only be reviewed for fundamental error. *See Bryant v. State*, 302 So. 3d 995, 999 (Fla. 1st DCA 2020). To establish fundamental error, the error

must be so serious that it undermines the validity of the trial, such that a guilty verdict could not have been reached without its influence. *See Knight v. State*, 286 So. 3d 147, 151 (Fla. 2019) (reaffirming the test for fundamental error set forth in *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960)).

Here, there was no error. Viewed in context, the challenged statement—the statement emphasized above—did not quote or paraphrase any portion of Young's interview. Instead, the prosecutor drew an inference about what Young's thought process must have been when he was performing the acts he described to the police—fetching a bin, putting the victim's body inside, loading the bin into the trunk of her car, and dumping her body by a dirt road. These statements continued the prosecutor's pattern of discussing the evidence and referring to the portions of the interview that corroborated that evidence.

But even if the prosecutor mischaracterized Young's words, no fundamental error occurred. The statement was brief and never repeated. The prosecutor then explained that Young told the police that he killed the victim in self-defense during an attempted robbery. The recorded police interview was introduced into evidence, allowing the jurors to hear Young's statements for themselves. The State's closing arguments challenged the plausibility of Young's self-defense theory, while defense counsel argued that Young's self-defense claim was believable. The jury was instructed on the justifiable use of deadly force. It was also instructed that what the attorneys said was not evidence, and the jury should not consider it as such.

Furthermore, the evidence of Young's guilt was overwhelming. He admitted to the police that after he hired the victim, she drove from Valdosta, Georgia to meet him at his hotel in Tallahassee. They had sex in his hotel room, and he strangled her to death. When he realized she was dead, he attempted to conceal the crime.

Other evidence corroborated his admissions. DNA on the victim's body confirmed his admission to sexual activity, and the police verified that Young was staying at the hotel he had named. The night the victim died, gas station surveillance captured Young

driving the victim's car. A few days after her body was discovered, an officer spotted the victim's car driving down the street and attempted to conduct a traffic stop. The driver parked the car beside a house and fled on foot. Around the same time, the police received a tampering alert from Young's ankle monitor in that area. Young later admitted during his police interview that he cut the monitor off and put it in a freezer near the house where the car was found. The police retrieved the monitor from the freezer. The GPS data from Young's ankle monitor placed him at the hotel where the victim was last seen alive, in the area where her body was dumped, and at the house where her car was found. Young's fingerprints were found on her car's door.

While Young claimed to have killed the victim while defending himself against a robbery attempt, ample evidence contradicted his theory. The victim had brought a stripper pole so that she could dance for Young. Young described the robbery attempt as occurring after the victim changed into a provocative pink outfit and started dancing. He noticed that his only hotel key card was missing and grew suspicious. A man burst into the room. Young struck the victim, and she retrieved a knife from her bag. Young grappled with the intruder while simultaneously disarming and choking the victim. While still choking the victim, he stabbed the man three times. The man fled the room. Young continued to choke the victim while she struggled, kicking the dresser, the refrigerator, and the microwave. She broke a handle off and knocked over the phone. Young believed the man who had tried to rob him was the victim's boyfriend because he looked like the person Young had seen in videos and pictures on the victim's cellphone. He provided a description of the man.

Contrary to Young's account, video surveillance showed the victim visiting a gas station across the street from the hotel just before she met with Young. She retrieved her purse from the front passenger's seat of her car. No one else appeared to be inside. She was alone when she went into the gas station and when she returned to her car. Hotel surveillance then captured her going up to the floor where Young's room was located. She was alone, carrying a bag and the pole. According to Young, the pole required assembly, and he had to help the victim put it together. Young's arrangement with the victim was for two hours of entertainment,

including sex, in return for $700. Two hours after going up to Young's room, the victim was captured on the hotel's surveillance. She was going back downstairs with her belongings, including the pole. She was dressed in a t-shirt and leggings.

The DNA evidence, along with Young's own admissions, proved that at some point during her visit, she and Young had sex. Yet Young's story did not explain how that sexual activity fit into his timeline of events. While the surveillance did not capture the victim returning to Young's room, the cameras were activated by motion sensors that did not always trigger. And she clearly returned, as Young admitted to killing her in the hotel room. There was no reasonable explanation for why, after the agreed-upon two-hour period had expired, the victim would change her clothes, pack up her belongings, disassemble the pole, and return to her car, only to turn back around, reassemble the pole, change her clothes, and perform again for Young so that her accomplice could rob him while she was dancing. The more logical theory was that the victim returned to Young's room to collect payment for her services. In fact, her boyfriend told the police that she had called him to tell him that the client she had seen had refused to pay.

During the investigation, the police spoke to the victim's boyfriend on the phone and in person. He matched the description Young had given of the man who tried to rob him. The police never found the victim's cellphone to confirm that he was in pictures and videos on her phone as Young described. But the victim's boyfriend was in videos and pictures on the website that advertised the victim's services, as well as the pictures she kept on her Google account. The boyfriend voluntarily provided a DNA sample. He allowed the police to check his body for stab wounds. The police did not find any. The police obtained his cellphone records, including location data. During the period in question, the boyfriend's cellphone never left Valdosta. Nor was there a break in his cellphone activity that would have lasted long enough to allow him to drive from Valdosta to Tallahassee without connecting to cell towers along the way.

Young also never explained how, if the intruder stole his only room key, he was able to leave his room to fetch a bin and return to put the victim's body inside it. And the steps Young took to

conceal the crime are inconsistent with self-defense. After killing the victim, Young not only failed to call for medical help or report the attempted robbery, but also traveled to another location to retrieve a storage bin and clothing, put the victim's body in the bin, concealed it with clothing, loaded it into her car's trunk, and drove to a remote location to dispose of it. He discarded her wig, her pole, and her bags along the way. He then cleaned the hotel room and got a friend to help him clean the car. In the days that followed, he hid from the police at a friend's house. When the police attempted a traffic stop while he was driving the victim's car, he abandoned the car, fled on foot, and removed his ankle monitor to avoid being tracked.

His self-defense theory was further undermined by the circumstances of the victim's death. Even if a robbery attempt had occurred, by Young's own admission, her accomplice ran away after Young stabbed him. By that time, Young had disarmed the victim and had her in a chokehold. Yet he continued to strangle her while she struggled. The medical examiner testified that it would have taken at least three minutes for her to die, and she may have passed out before then. Thus, after the threat was neutralized and the robbery attempt was over, Young continued to use deadly force against a petite, unarmed woman. These circumstances contradict his claim of self-defense. *See Bogart v. State*, 114 So. 3d 316, 318–19 (Fla. 4th DCA 2013) (concluding that in a second-degree murder case, defendant's self-defense theory was undermined by his failure to report the victim's death, his attempts to conceal the crime, and the fact that in the time it would have taken to strangle her to death, there was "sufficient time to withdraw from any legitimate acts of self-defense").

For these reasons, any error in the State's opening statement did not vitiate the entire trial such that the guilty verdict could not have been obtained without it. Thus, Young is not entitled to reversal on this issue.

## II

Next, Young challenges the trial court's ruling on his motion in limine. Prior to trial, defense counsel argued for the exclusion of the evidence that Young was wearing an ankle monitor at the time

6

of the offense. Counsel noted that the jury could infer from that evidence that Young was either on bail or serving a sentence for an unrelated crime. Counsel asserted that while the ankle monitor evidence was probative, its probative value was substantially outweighed by the danger of unfair prejudice.

The State countered that the evidence was extremely probative, as the tampering alert in the area where the victim's car was abandoned caused the police to identify Young as a suspect. And not only did the GPS data obtained from the monitor confirm Young's presence at key locations involved in the murder, but the fact that he cut the ankle monitor off and hid it showed his consciousness of guilt. The State agreed not mention or reference the reason that Young was wearing the monitor. When the trial court denied the motion, it reiterated that the State should not mention the reason Young was wearing the monitor.

Before a detective testified about the GPS data obtained from Young's ankle monitor, the trial court instructed the jury, "Evidence of a GPS monitor being used by the defendant has been introduced in this case. You are not to speculate or consider for any reason why the defendant used or was in possession of a GPS monitor. Such should not influence how you consider such evidence."

We review a trial court's ruling on the relevance of evidence and whether its probative value is outweighed by the risk of unfair prejudice under the abuse of discretion standard. *See Peede v. State*, 955 So. 2d 480, 499 (Fla. 2007). This standard is only satisfied if no reasonable person would have taken the same view as the trial court. *Wilcox v. State*, 143 So. 3d 359, 373 (Fla. 2014). A harmless error analysis applies to the admission of evidence that fails the section 90.403, Florida Statutes (2022), balancing test. *See Carillo v. State*, 727 So. 2d 1047, 1048 (Fla. 2d DCA 1999). Harmless error requires the State to "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986).

Section 90.403 provides for the exclusion of relevant evidence where "its probative value is substantially outweighed by the danger of unfair prejudice." The strength of the challenged evidence should be considered in the context of the other facts in the record and weighed against the strength of the reason for excluding that evidence. *See Horton v. State*, 943 So. 2d 1016, 1017–18 (Fla. 2d DCA 2006) (citing Charles W. Ehrhardt, *Florida Evidence* § 403.1 (2006 ed.) (footnotes omitted)). Relevant factors include the necessity of the evidence, the tendency of the evidence to suggest an improper basis for the jury's verdict (e.g., emotion), the "chain of inference necessary to establish the material fact," and "the effectiveness of a limiting instruction." *Taylor v. State*, 855 So. 2d 1, 22 (Fla. 2003) (quoting *State v. McClain*, 525 So. 2d 420, 422 (Fla. 1988)).

Here, the challenged evidence was strongly probative of Young's involvement in the victim's death and the concealment of the crime. The GPS data confirmed Young's presence at the hotel where the victim was last seen alive on the night that she died, in the remote area where her body was discovered the next morning, and near the house where the victim's car was found at the time the car was abandoned. Granted, there was other evidence to prove these matters, including Young's admission to killing the victim at the hotel, dumping her body by the dirt road, and driving her car. Additionally, DNA evidence connected him to the victim, gas station surveillance showed Young driving her car, and his fingerprints were found on the car's door. But even if this minimized the probative value of the GPS data, other evidence pertaining to the ankle monitor was relevant to show consciousness of guilt.

An alert from the ankle monitor reflected that around the time the car was abandoned, Young cut off the monitor in the same area. Young admitted to the police that he removed the ankle monitor and hid it in a freezer nearby. This continued Young's pattern of attempting to conceal the crime and elude the police, which undermined his claim of self-defense.

Young argues that the removal of his ankle monitor does not show consciousness of guilt for the murder, claiming he may have removed it simply to avoid arrest for driving a stolen car, not

because he was trying to hide involvement in the killing. Evidence is relevant to prove a defendant's consciousness of guilt where there is a "nexus between the flight, concealment, or resistance to lawful arrest and the crime(s) for which the defendant is being tried in that specific case." *Partin v. State*, 82 So. 3d 31, 38 (Fla. 2011) (quoting *Escobar v. State*, 699 So. 2d 988, 995 (Fla. 1997), *abrogated on other grounds by Connor v. State*, 803 So. 2d 598 (Fla. 2001)). But "[t]he fact that there were conflicting theories on the meaning to be attached to the evidence does not demonstrate that the trial judge abused his discretion in admitting the evidence." *Penalver v. State*, 926 So. 2d 1118, 1133 (Fla. 2006). Thus, the fact that Young might have had another reason for his actions did not render the evidence inadmissible.

Even so, any error in the admission of the ankle monitor evidence was harmless. The trial court instructed the jury not to speculate on the reason for Young's possession of the ankle monitor or consider it for any reason. The reason for Young's use of the ankle monitor was never mentioned. On its own, the monitor's existence may have suggested that Young committed another crime. But it did not suggest a propensity to commit murder or any other violent offense. *Cf. Partin*, 82 So. 3d at 39 (holding that the introduction of defendant's statement that he was not supposed to own firearms was harmless based in part on the fact it did not clearly suggest that he was violent); *Trahan v. State*, 285 So. 3d 361, 363 (Fla. 1st DCA 2019) (holding that it was harmful error to allow the introduction of a checkbook that was unconnected to the charged burglary because it suggested that defendant, "an accused thief," was prone to theft because he had someone else's checkbook in his possession). The limiting instruction and the lack of any explanation for the ankle monitor minimized the risk that the jury was unfairly influenced by that evidence. When these factors are considered alongside the compelling permissible evidence outlined in Issue I, there is no reasonable possibility that the error contributed to Young's conviction. Therefore, we affirm on this issue as well.

AFFIRMED.

KELSEY and WINOKUR, JJ., concur.

———————————————————

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

———————————————————

Baya Harrison, III, Monticello, for Appellant.

James Uthmeier, Attorney General, and Michael Layton Schaub, Assistant Attorney General, Tallahassee, for Appellee.